ORAL ARGUMENT NOT YET SCHEDULED

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| AIR ALLIANCE HOUSTON, *et al.*,<br>Petitioners,<br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, Administrator, U.S. Environmental Protection Agency,<br>Respondents. | No. 26-1070 (consolidated with No. 26-1072) |

**PETITIONERS' JOINT MOTION FOR LIMITED ABEYANCE PENDING EPA ACTION ON PETITION FOR ADMINISTRATIVE RECONSIDERATION**

Petitioners in these consolidated cases respectfully move for a six-month abeyance to allow respondent Environmental Protection Agency ("EPA") to act upon a petition for administrative reconsideration, thereby facilitating the timely and efficient adjudication of all challenges to the challenged agency action.

## INTRODUCTION

Coal- and oil-fired power plants are one of the nation's largest sources of emissions of mercury and other toxic metals like arsenic, chromium, and lead—dangerous hazardous air pollutants ("HAP" or "air toxics") that have devastating

adverse impacts on human health. On February 24, 2026, EPA published a final rule weakening standards for air toxics emissions from coal- and oil-fired plants, *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units: Final Repeal*, 91 Fed. Reg. 9,088 (Feb. 24, 2026) ("Final Repeal"), rescinding necessary revisions to the standards EPA had established in 2024, 89 Fed. Reg. 38,508 (May 7, 2024) ("2024 Rule"). The Final Repeal reverts to outdated standards more than a decade old, allowing the nation's highest-polluting plants to continue operating without adequate emission controls and subjecting nearby communities to significant, and wholly unnecessary, harm.

The Final Repeal's reasoning in support of the rescission of the 2024 filterable particulate matter ("fPM") standard, which limits the emissions of toxic metals like arsenic and lead, rests on certain new legal theories and analyses that were not part of EPA's proposed rule, 90 Fed. Reg. 25,535 (June 17, 2025), and yet formed central justifications for EPA's final rule. EPA failed to provide public notice or an opportunity to comment on these new legal theories and justifications, in violation of Clean Air Act Section 307(d)(3). 42 U.S.C. § 7607(d)(3). Specifically, in the Final Repeal, EPA adopted and relied on several new and erroneous legal positions to support the rescission, included new information that revealed errors in its cost-effectiveness calculations, and made other new arbitrary

and indefensible errors. Because of this, Petitioners in No. 26-1070 ("Public Interest Petitioners") filed a petition for administrative reconsideration of the Final Repeal, pursuant to the Clean Air Act, detailing each of these foundational flaws so that EPA may address its errors. *See id.* § 7607(d)(7)(B). Petitioners in No. 26-1072 ("State and Local Government Petitioners") filed a letter in support of the Public Interest Petitioners' petition. Under the Clean Air Act, judicial review of issues subject to administrative reconsideration must await EPA's final action on the reconsideration petition. *See Util. Air Regul. Grp. v. EPA*, 744 F.3d 741, 747 (D.C. Cir. 2014).

Petitioners now respectfully request that the Court hold these consolidated cases in abeyance for six months, to provide Respondents EPA and its Administrator Lee Zeldin (collectively, EPA or the "Agency") time to take action on the pending petition for administrative reconsideration. EPA's new analyses and legal interpretations, included for the first time in the Final Repeal, provided wholly new justifications—distinct from those proposed—for the rescission of the 2024 Rule's standards. Those justifications, and Public Interest Petitioners' objections thereto, are central to the Final Repeal, and to the challenges pending before this Court. The requested six-month abeyance will allow EPA sufficient time to grant the petition and complete reconsideration, or to deny it. This will allow the litigation to proceed with a full record, and for all issues, including any

remaining disputes about the Final Repeal's procedural defects, to be resolved in a single judicial proceeding, thereby promoting efficient and orderly judicial review.

Petitioners note that some of the same petitioners have had to make several similar requests for abeyance or deferral in recent cases involving Clean Air Act rulemakings, in response to the Administration's repeated abuse of the notice-and-comment process in its rush to finalize a sweeping array of anti-environmental rules advancing its deregulatory agenda.[1] But the government's haste to dismantle health-protective regulations does not excuse the circumvention of procedural safeguards in denying the public a meaningful opportunity to comment on the major—and often unsupported—rationales underlying these rollbacks. The Administration's recent recurring practice of introducing new justifications, theories, data, and reasoning in final rules—rationales and analyses that differ

---

[1] *See*, e.g., Petitioners' Motion for a Limited Abeyance Pending Respondents' Final Action on Petitions for Administrative Reconsideration, *Sierra Club v. EPA*, No. 26-1055, ECF #2171960 (filed May 5, 2026) (seeking 6-month abeyance pending administrative reconsideration in Clean Air Act rulemaking finalizing weak emissions standards for combustion turbines in which EPA announced only in final rule a new policy not to count health benefits); Motion to Defer Call for Briefing Proposals Pending EPA Action on Administrative Petitions, or, in the Alternative, to Sever Issue, *Am. Public Health Ass'n v. EPA*, No. 26-1037, ECF #2169572 (filed Apr. 20, 2026) (moving to pause setting of briefing schedule to allow EPA to act on administrative reconsideration petition addressing EPA's introduction into greenhouse gas endangerment finding rescission final rule of an entirely new methodology and analysis not set forth in proposed rule).

materially from the relevant proposals—highlights the importance of ensuring that the Administration is held to fundamental principles of fairness and proper notice-and-comment procedure.

Moreover, this request will not prejudice any party. All petitioners agree that abeyance, despite meaning some delay in the near term, would advance the efficient adjudication of challenges to the Final Repeal. The requested abeyance will not injure EPA or any Respondent-Intervenors, as the Final Repeal is now in effect. Petitioners have not asked EPA or this Court to stay the Final Repeal's effective date, notwithstanding EPA's errors. A time-limited abeyance will encourage EPA to act expeditiously on the reconsideration petition and will prevent greater delay and uncertainty associated with potential piecemeal litigation of the lawfulness of the Final Repeal. A grant of reconsideration may obviate the need for further litigation of certain issues raised by Public Interest Petitioners. If EPA denies reconsideration, Petitioners have the right to petition for review of that action, and can seek to consolidate it with this case so that the Court can review all related challenges to the Final Repeal at once.

Respondents and movant-intervenors Lignite Energy Council; National Mining Association; NACCO Natural Resources Corporation; National Rural Electric Cooperative Association; America's Power; Associated Electric Cooperative, Inc.; Basin Electric Power Cooperative; Big Rivers Electric

Corporation; East Kentucky Power Cooperative, Inc.; Minnkota Power Cooperative, Inc. and Sunflower Electric Power Corporation oppose this motion.

Movant-intervenors Luminant Generation Company; Oak Grove Management Company LLC; NorthWestern Energy and Westmoreland Mining Holdings LLC reserve taking positions on the motion pending review of the filed motion.

Movant-intervenors States of North Dakota, et al.; and respondent-intervenors Talen Montana, LLC and Talen Energy Supply take no position on this motion. Midwest Ozone Group provides no response.

## BACKGROUND

### A. Statutory and Regulatory Background

In 2012, EPA established emissions limits for mercury and other hazardous air pollutants from power plants, one of the nation's largest sources of these toxic emissions. 77 Fed. Reg. 9,304 (Feb. 16, 2012). Exposure to these pollutants is associated with various adverse health effects including central nervous system damage, kidney damage, and cancer, especially for those living in close proximity to emission sources. 89 Fed. Reg. at 38,509. Section 112(d)(6) of the Clean Air Act requires EPA to periodically revise its air toxics standards "as necessary" "taking into account developments in practices, processes, and control technologies." 42 U.S.C. § 7412(d)(6). In keeping with that mandate, and based on an extensive legal

and factual record, EPA revised the air toxics standards in 2024. In that revision, EPA (1) removed a loophole for lignite-burning coal plants that allowed them to emit over three times as much mercury as non-lignite coal plants; (2) tightened the surrogate particulate matter standard (the fPM standard) for metallic hazardous air pollutants such as chromium, lead, and nickel; and (3) required facilities to use continuous emissions monitoring systems (CEMS) for monitoring toxic metal emissions. 89 Fed. Reg. 38,508, 38,510. The 2024 Rule demonstrated that the specified tightening of hazardous air pollutant emission standards required only the worst-performing, highest-polluting plants to reduce their emissions to the levels achieved by the vast majority of their peers. *See id.* at 38,530 ("[O]nly 33 EGUs are currently operating above" the revised fPM limit); 38,555 ("The units requiring additional fPM and/or [mercury] removal" to comply "are projected to generate less than 2 percent of total generation in 2028"). The updated standards nonetheless delivered substantial health benefits because these few laggard plants emit large volumes of toxic pollution. By targeting that handful of especially dirty units, the 2024 Rule achieved significant reductions in toxic pollution at very modest costs. *See id.* at 38,533 (cost of meeting revised fPM standard amounts to "about 0.03 percent" of total power sector sales); 38,549 ("[I]n 2021, lignite-fired [coal plants] were responsible for almost 30 percent of all [mercury] emitted from coal-fired [plants] while generating about 7 percent of total megawatt-hours").

Nevertheless, in June 2025, EPA reversed course, proposing to withdraw key provisions of the 2024 Rule. 90 Fed. Reg. at 25,535. EPA finalized the rule in February 2026, rescinding these three key components of the 2024 Rule. As a consequence, the Final Repeal will significantly increase emissions of toxic air pollutants even though the technologies to control that pollution are readily available and currently in use at many plants. It will also result in significant increases in other harmful air pollution. The Agency premised the Final Repeal on new, unanticipated rationales and legal interpretations that did not appear in the proposal and were never noticed to the public.

**B. Procedural Background**

Public Interest Petitioners, which include 20 public health and environmental organizations, filed a timely petition for review of the Final Repeal on March 30, 2026. *See* 42 U.S.C. § 7607(b)(1); ECF #2166505. State and Local Government Petitioners—a coalition of 17 states, the District of Columbia, and three local governments—filed a timely petition for review on March 31, 2026. *State of Illinois, et al. v. EPA*, No. 26-1072; ECF #2166528. On April 1, 2026, this Court consolidated Nos. 26-1070 and 26-1072 and issued an initial scheduling order setting May 1, 2026, as the due date for filing initial submissions and procedural motions, and May 18, 2026, as the due date for filing dispositive motions and the administrative record. ECF #2166533.

On April 24, 2026, in light of the significant procedural and substantive infirmities in the Final Repeal, Public Interest Petitioners also petitioned EPA to reconsider aspects of the Final Repeal pursuant to Clean Air Act Section 307(d)(7)(B), 42 U.S.C. § 7607(d)(7)(B).[2] State and Local Government Petitioners filed a letter in support of that reconsideration petition on May 15, 2026. The reconsideration petition identifies multiple legal theories, analyses, and rationales in the Final Repeal for which EPA did not provide public notice and opportunity for comment, and explains why EPA's errors are of "central relevance" to the Final Repeal, 42 U.S.C. § 7607(d)(7)(B). *First*, EPA's Final Repeal provided, for the first time, information unmasking that EPA's incremental cost calculations for the 2024 fPM standard erroneously included costs associated with fly ash removal that sources in fact already bear independent of the fPM standard. This material error skewed EPA's pivotal determination that the 2024 standard is not cost-effective. *Second*, in the Final Repeal, EPA adopted a new position categorically rejecting industry-specific cost considerations, a position that lacks foundation in the statute or reasoned decisionmaking and that was likewise central to EPA's decision.

---

[2] Air Alliance Houston et al., Petition for Reconsideration of EPA's Final Rule: National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units, Docket No. EPA-HQ-OAR-2018-0794 (Apr. 24, 2026). A copy is attached hereto as Exhibit 1. In the reconsideration petition, Ex. 1 at 5, Public Interest Petitioners reserved the right to seek immediate judicial review of any of the issues covered and did not concede that any issues were not raised with reasonable specificity or exhausted.

*Third*, in the Final Repeal, EPA announced a new—and erroneous—legal position incorporating the one-in-one-million cancer risk test from Clean Air Act Section 112(f)(2), 42 U.S.C. § 7412(f)(2), into EPA's separate and distinct analysis under Section 112(d)(6). *Fourth*, in the Final Repeal, EPA arbitrarily limited its consideration of risk in its Section 112(d)(6) review by refusing to consider risk information outside its prior Section 112(f)(2) review.[3] *Fifth*, EPA's Final Repeal relied on the results of its 2020 Section 112(f)(2) residual risk review in a manner that conflicts with EPA's recently announced position that it lacks authority to revisit residual risk reviews. And *sixth*, EPA for the first time announced that it would not quantify or monetize the health benefits associated with the 2024 Rule's reductions in NOx and $PM_{2.5}$—something it had done in prior rulemakings and in the 2025 proposal. EPA's notice of proposed rulemaking, 90 Fed. Reg. 25,535, failed to provide adequate notice as to each of these fundamental issues, and, accordingly, it was impracticable for Public Interest Petitioners or anyone else to raise certain objections presented in the reconsideration petition. These infirmities were central to EPA's rationale for the Final Repeal, and allowed the Agency to

[3] Public Interest Petitioners disagree that the best reading of the statute permits EPA to consider health risk in setting standards under Section 112(d)(6)'s technology review provision. However, *if* EPA chooses to improperly consider risk in this inquiry, the Agency should not compound that error by considering only hand-picked, outdated information regarding risk. The public was never given the opportunity to comment on EPA's approach regarding relevant health risk, because that approach was never presented prior to publication of the Final Repeal.

finalize an unlawful rule rescinding standards that were consistent with what the Clean Air Act requires. The reconsideration petition remains pending before EPA.

On April 30, 2026, this Court granted Public Interest Petitioners' unopposed motion for an extension of time to file procedural motions to May 18, 2026, to allow the parties to coordinate regarding how to best proceed with any procedural motions in light of the reconsideration petition. *See* ECF #2170653; ECF #2171348.

## ARGUMENT

This Court has discretion to pause proceedings before it, incident to its general power to control its docket. *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). The Court exercises that power with an eye toward "weigh[ing] competing interests and maintain[ing] an even balance." *Id.* That power is routinely exercised to temporarily defer judicial review of agency action while an agency is engaged in further administrative proceedings, including in the Clean Air Act context. *See, e.g.*, Order, *Sierra Club. v. EPA*, No. 26-1055 (April 24, 2026) (severing American Petroleum Institute's claims from case, designating new case No. 26-1053, and granting Institute's and EPA's joint motion to place case in abeyance pending EPA's review of the Institute's petition for administrative reconsideration) (ECF #2170287); *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386-90 (D.C. Cir. 2012); *Time Warner Ent. Co., LP v. FCC*, 240 F.3d 1126, 1128 n.1 (D.C. Cir. 2001);. The

Court's inquiry into whether judicial review should be paused pending EPA's consideration of a Clean Air Act reconsideration petition is inherently case-specific. *See, e.g.*, *Lead Indus. Ass'n v. EPA*, 647 F.2d 1184, 1187 (D.C. Cir. 1980). So long as the new information underlying a reconsideration petition "raises substantial questions about the validity of the Agency's analysis," *id.*, the Court is well within its discretion to defer judicial proceedings as needed to serve the interests of the parties and the Court.

Here, a six-month abeyance will facilitate the fair and orderly resolution of this litigation. The Clean Air Act directs that if a party identifies an objection that was impracticable to raise in the comment period for a rulemaking, and such objection is of "central relevance" to the rule, EPA must grant reconsideration. 42 U.S.C. § 7607(d)(7)(B). And the Clean Air Act expressly requires that EPA provide notice and an opportunity for the public to comment on any data, methodology, legal interpretations, or policy considerations in a proposed rule. 42 U.S.C. § 7607(d)(3). Public Interest Petitioners' reconsideration petition identified several foundational issues in the Final Repeal for which EPA provided no notice or opportunity for public comment, and the petition "'provides substantial support for the argument that the regulation should be revised.'" *Coal. for Responsible Regul. v. EPA*, 684 F.3d 102, 125 (D.C. Cir. 2012) (citation omitted), *cert. denied in relevant part*, 573 U.S. 302 (2014); *see also Chesapeake Climate Action*

*Network v. EPA*, 952 F.3d 310, 322 (D.C. Cir. 2020). In particular, the reconsideration petition raises objections to EPA's new legal interpretations, rationales, and analyses, which form the basis of the Final Repeal's rescission of the 2024 Rule's standards, including EPA's consideration of the cost-effectiveness of the fPM standard and EPA's unlawful consideration of health risk in setting standards under Clean Air Act Section 112(d)(6). The Final Repeal's theories, rationales, and justifications differ substantially from what EPA had proposed.

For instance, EPA's Final Repeal contained—for the first time—data that brought to light a material error in EPA's calculations of the incremental costs resulting from the 2024 fPM standard. Although EPA's cost workbooks did not disclose the underlying formulas, EPA's correction in the Final Repeal of a separate annualization error made visible a second error: EPA had erroneously included the costs associated with fly ash removal that sources in fact already bear independent of the fPM standard, thereby skewing EPA's pivotal determination—central to its decision to repeal the standards, *see* 91 Fed. Reg. at 9,096—that the 2024 standard's cost-effectiveness values are significantly higher than other technology review rules. Correcting the errors substantially changes the 2024 Rule's fPM standards' cost-effectiveness values (making them more cost-effective). EPA's erroneous cost-effectiveness values provided the primary basis for EPA's determination in the Final Repeal, and therefore the error—only

discernable in the Final Repeal—is "of central relevance to the outcome of the rule." 42 U.S.C. § 7607(d)(7)(B).

In the Final Repeal, EPA also presented a new legal position that the very act of considering industry-specific characteristics when evaluating cross-source-category cost-effectiveness comparisons is "inappropriate" under the statute—a position that was never proposed and never subjected to public comment. *See* 91 Fed. Reg. at 9,096-97. This position represents a significant departure from EPA's longstanding practice of routinely considering industry-specific characteristics—including sector size, number of affected facilities, total revenues, cost-to-revenue ratios, and the industry's ability to absorb compliance costs—when evaluating the reasonableness of cost-effectiveness values across different source categories. *See, e.g.*, 89 Fed. Reg. at 38,524-25. EPA's proposal gave no notice that the Agency would adopt such a categorical position—which is contrary to the best reading of the relevant statute—and thus provided no opportunity for comment.

Additionally, for the first time in the Final Repeal, EPA interpreted the statute to allow EPA to refuse to strengthen emission standards in a section 112(d)(6) technology review when the entirely separate risk review under section 112(f)(2) found lifetime excess cancer risk to be less than one in one million and costs per ton of emission reduction are above "the low end." 91 Fed. Reg. at 9,109. Section 112(f)(2) provides direction to EPA on when the Agency must promulgate

health risk standards—in relevant part, when standards set separately under Clean Air Act Section 112(d), "do not reduce lifetime excess cancer risks to…less than one in one million." 42 U.S.C. § 7412(f)(2)(A). In the Final Repeal, EPA for the first time imports Section 112(f)(2)'s one-in-one-million cancer risk test into the separate inquiry whether to revise emission standards under Clean Air Act Section 112(d)(6). That section directs EPA to "revise as necessary" the emission standards, provides its own, separate technology-based standard-setting criteria ("developments in practices, processes, and control technologies"), and does not permit any consideration of health risks (and therefore necessarily precludes EPA's new legal interpretation). *Id.* § 7412(d)(6). To support this novel—and erroneous—interpretation, EPA relied on the reference in section 112(f)(2)(A) to cancer risk less than one in one million, without providing any notice in its proposal it would do so. *See* 91 Fed. Reg. at 9092. Indeed, in the proposal, EPA justified the *proposed* rescission based only on the fPM standard's cost-effectiveness, *see, e.g.*, 90 Fed. Reg. at 25,541, and had not justified the proposal on the basis of a health risk analysis at all. EPA's new approach blatantly contravenes section 112(d)(6), which by its terms does not permit any consideration of health risks in a technology review. *See* 42 U.S.C. § 7412(d)(6).

Moreover, EPA asserted for the first time in the Final Repeal that not only can the Agency consider risk but that such inquiry is specifically *limited to* "the

conclusions of the section 112(f)(2) risk review" the Agency conducted in 2020.[4] 91 Fed. Reg. at 9,095. Thus, EPA's failure to provide notice and an opportunity to comment on its approach of confining consideration of risk to the 2020 section 112(f)(2) review—regardless of how obsolete the science has become—is arbitrary and capricious.

Finally, EPA announced for the first time in the Final Repeal that it would not quantify or monetize the health benefits associated with the 2024 Rule's reductions in $NO_x$ and $PM_{2.5}$—values it had historically quantified, including in the 2025 proposal. *See, e.g.*, *Regulatory Impact Analysis for the Proposed Repeal of Amendments to National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units* at 3-4 (June 2025). In declining to project or consider the forgone health benefits, EPA disregarded decades of guidance from experts, its own formal economic analysis guidelines, and a large body of empirical evidence documenting a strong relationship between pollution exposure, mortality, and morbidity. EPA made that arbitrary and capricious decision without any advance notice or solicitation of public comment.

---

[4] EPA's Final Repeal also suggests that the Agency believes this risk review cannot be updated with new risk information as it becomes available. *See, e.g.*, 91 Fed. Reg. at 9,109 ("The EPA is finalizing the position that the Agency may consider the results of the *one-time* residual risk review requirement under CAA section 112(f)(2) in determining whether it is 'necessary' to revise standards at the conclusion of subsequent CAA section 112(d)(6) technology reviews.") (emphasis added).

EPA plainly failed to follow the Clean Air Act's notice-and-comment requirements for each of these key elements of the Final Repeal. This constitutes a "serious procedural error" that directly led EPA to finalize standards that fall far short of the Clean Air Act's statutory mandates. 42 U.S.C. § 7412(d)(2), (6); *see Conn. Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525, 530-31 (D.C. Cir. 1982) ("An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary.").

A six-month abeyance would provide EPA ample time to act on Public Interest Petitioners' objections raised in the reconsideration petition. This Court has granted abeyances or otherwise deferred briefing pending administrative reconsideration in other Clean Air Act cases, even over EPA's opposition, *see, e.g.*, *Am. Trucking Ass'ns, Inc. v. EPA*, No. 97-1440, 1998 WL 65651, at *1-2 (D.C. Cir. Jan. 21, 1998) (granting opposed motion to hold case in abeyance pending EPA's disposition of reconsideration petition); *Sierra Club v. EPA*, 551 F.3d 1019, 1023 (D.C. Cir. 2008); *New York v. EPA*, No. 02-1387, 2003 WL 22326398, at *1 (D.C. Cir. Sept. 30, 2003); *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386-87, 389 (D.C. Cir. 2012).[5] Six months is sufficient for EPA to take final

---

[5] *See also Lead Indus. Ass'n v. EPA*, 647 F.2d 1184, 1185-86 (D.C. Cir. 1980) (noting case was placed on hold, with the Court requesting status updates from EPA, pending the Agency's decision to grant or deny reconsideration); *Alon*

action on reconsideration, especially since EPA has already had almost a month to consider Public Interest Petitioners' reconsideration petition, which was submitted on April 24, 2026.[6] A grant of reconsideration could enable EPA to correct the multiple significant errors identified in the reconsideration petition, thus narrowing the issues to be decided by this Court. If EPA were to deny the reconsideration petition, any challenge to such denial could be efficiently consolidated with this case. Consolidation would ensure this Court can consider all interrelated objections to the Final Repeal in a single proceeding, thus preventing inefficient piecemeal litigation that would prolong uncertainty about EPA's Final Repeal.

---

*Refining Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 639 (D.C. Cir. 2019) (noting that Court had held petitions for review in abeyance pending EPA's disposition of reconsideration petitions); *Sierra Club v. EPA*, 884 F.3d 1185, 1191 (D.C. Cir. 2018) (petitions for review held in abeyance pending EPA's reconsideration); *Time Warner Ent. Co. v. FCC*, 240 F.3d 1126, 1128 n.1 (D.C. Cir. 2001) (noting Court held challenges to rule in abeyance while agency completed a related new rulemaking); *Devia v. NRC*, 492 F.3d 421, 427 (D.C. Cir. 2007); *Basardh v. Gates*, 545 F.3d 1068, 1069 (D.C. Cir. 2008).

[6] *See, e.g.*, EPA, *Basis for Partially Denying Administrative Petitions of Specific Provisions of the Subpart W 2024 Final Rule* at 1 (Jan. 1, 2025), https://www.epa.gov/system/files/documents/2025-01/the-epas-basis-for-partially-denying-administrative-petitions-of-specific-provisions.pdf (acting on reconsideration petitions in 5 months); EPA, *Basis for Denying, in Part or Whole, Petitions for Reconsideration* at 2 (Jan. 8, 2025), https://www.epa.gov/system/files/documents/2025-01/enclosure-1-8-25.pdf (acting on reconsideration petitions in 5.5 months); EPA, *Basis for Partially Denying Petitions for Reconsideration of the Good Neighbor Plan on Grounds Related to Judicial Stays of the SIP Disapproval Action as to 12 States* at 6 (Mar. 27, 2024), https://www.epa.gov/system/files/documents/2024-03/basis-for-partial-denial-of-petitions-for-reconsideration-of-good-neighbo.pdf (acting on reconsideration petitions in 7.5 months).

The requested abeyance would not prejudice any party. The Final Repeal remains in effect, so the delay would not alter its implementation or harm parties benefited by it. *See Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 427-28 (D.C. Cir. 2007). Further, the timing of EPA's action on the reconsideration petition is within the Agency's control. Given the significance of the disputed standards for public health and the environment, the Court should limit such delay to six months to ensure that EPA acts in a timely fashion. Should EPA take final action before the lapse of six months by denying the petition, petitioners will have the ability to promptly seek review of that order in this Court and move to consolidate that case with this one, lift the abeyance, and set a briefing schedule.

Immediate briefing at this time would prejudice Petitioners. Their petition for reconsideration to EPA raises objections that were impracticable to raise during the public comment period and are of central relevance. If forced to litigate the case now, Petitioners could be barred from raising centrally relevant objections not previously raised by the Clean Air Act's administrative exhaustion provision, 42 U.S.C. § 7607(d)(7)(B). *See Coal. for Renewable Natural Gas v. EPA*, 108 F.4th 846, 858 (D.C. Cir. 2024). It is fundamentally unfair for EPA to introduce new and material justifications and data in its final rule and then oblige parties to brief their challenges to it without the ability to pursue the full set of objections. When, as here, all challengers to a rule support an approach that would ultimately enable

litigating challenges to the rule together in one consolidated case, and the rule is in effect with no stay requests asserted, the equities are decidedly one-sided.

Immediate briefing would also disserve the interests of judicial economy. Because objections that Petitioners raised in the petition for reconsideration to EPA were impracticable to raise during the public comment period and are of central relevance, section 307(d)(7)(B) requires EPA to grant reconsideration. 42 U.S.C. § 7607(d)(7)(B). Because EPA's reconsideration proceedings could either resolve or narrow the issues on reconsideration, proceeding with review of the Final Repeal now is not a good use of the Court's resources. Granting the requested abeyance would be the best path to a fair and orderly adjudication of this petition and in the interests of all parties and the Court.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court hold this case in abeyance for six months to permit EPA to take final action on Public Interest Petitioners' pending administrative reconsideration petition. If EPA takes final action before six months elapses, the parties should be directed to confer and submit proposed briefing formats within 21 days of EPA's action. Petitioners further request that the Court order EPA to file reports every 60 days concerning the status of the ongoing administrative proceedings.

Respectfully submitted,

/s/ Deborah M. Murray
Deborah M Murray
Southern Environmental Law Center
120 Garrett Street, Suite 400
Charlottesville, VA 22902
(434) 977-4090
dmurray@selc.org

*Counsel for American Academy of Pediatrics, American Lung Association, American Public Health Association, and Physicians for Social Responsibility*

/s/ Sarah A. Buckley
Sarah A. Buckley
John Walke
Emily Davis
Sheena Patel
Natural Resources Defense Council, Inc.
1152 15th St. NW, Suite 300
Washington, D.C. 20005
sbuckley@nrdc.org
jwalke@nrdc.org
edavis@nrdc.org
spatel@nrdc.org
Tel: (202) 836-9555

*Counsel for Natural Resources Defense Council*

/s/ Sean H. Donahue
Sean H. Donahue
Keri R. Davidson
Chloe H. Kolman
Donahue, Goldberg, Herzog & Davidson
1008 Pennsylvania Ave., SE
Washington, DC 20003
Tel: (202) 277-7085
sean@donahuegoldberg.com
keri@donahuegoldberg.com
chloe@donahuegoldberg.com

Surbhi Sarang
Richard Yates
Vickie L. Patton
Environmental Defense Fund
2060 Broadway St., Ste. 300
Boulder, Colorado 80302
Tel: (303) 440-4901
ssarang@edf.org
ryates@edf.org
vpatton@edf.org

*Counsel for Environmental Defense Fund*

/s/ Nicholas Morales
Nicholas Morales
Kevin Breiner
James S. Pew
Earthjustice
1250 I St. NW, Fourth Floor
Washington, D.C. 20005
(202) 667-4500
nmorales@earthjustice.org
kbreiner@earthjustice.org
jpew@earthjustice.org

*Counsel for Petitioners Air Alliance Houston, Chesapeake Climate Action Network, Clean Air Council, Downwinders at Risk, Kentucky Resources Council, Montana Environmental Information Center, and Sierra Club*

/s/ Shaun A. Goho
Shaun A. Goho
Hayden W. Hashimoto
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
617-624-0234
sgoho@catf.us
hhashimoto@catf.us

*Counsel for Alliance of Nurses for Healthy Environments, Citizens for Pennsylvania's Future, Clean Wisconsin, Conservation Law Foundation, and Natural Resources Council of Maine*

/s/ Sanjay Narayan
Sanjay Narayan
Sierra Club Environmental Law Program
2101 Webster St., Ste. 1300
Oakland, CA 94612
(415) 977-5769
sanjay.narayan@sierraclub.org

*Counsel for Sierra Club*

/s/ Brian H. Lynk
Brian H. Lynk
Environmental Law & Policy Center
740 15th Street, NW, Suite 700
Washington, DC 20005
(240) 461-4241
blynk@elpc.org

*Counsel for Plaintiffs Environmental Law & Policy Center and Dakota Resource Council*

**STATE OF ILLINOIS**
KWAME RAOUL
ATTORNEY GENERAL

/s/ *Jason E. James*
JASON E. JAMES
Assistant Attorney General
JOANNA BRINKMAN
Complex Litigation Counsel
CHRISTOPHER M.R. TURNER
Supervising Attorney, Civil Appeals
MATTHEW J. DUNN
Chief, Environmental Enforcement/
Asbestos Litigation Division
Illinois Attorney General's Office
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(217) 843-0322
jason.james@ilag.gov
joanna.brinkman@ilag.gov
christopher.turner@ilag.gov
matthew.dunn@ilag.gov

**STATE OF MINNESOTA**
KEITH ELLISON
ATTORNEY GENERAL

*/s/ Peter Surdo*
PETER SURDO
CAT RIOS-KEATING
ALYSSA BIXBY-LAWSON
RYAN PESCH
Special Assistant Attorneys General
Office of the
Minnesota Attorney General
445 Minnesota St., Suite 600
St. Paul, MN 55101
(651) 757-1244
peter.surdo@ag.state.mn.us
catherine.rios-keating@ag.state.mn.us
alyssa.bixby-lawson@ag.state.mn.us
ryan.pesch@ag.state.mn.us

**STATE OF ARIZONA**
KRIS MAYES
ATTORNEY GENERAL

*/s/ Kirsten Engel*______
KIRSTEN ENGEL
Special Attorney General
Environmental Protection Unit
2005 N. Central Ave.
Phoenix, AZ 85085
(520) 209-4020
Kirsten.Engel@azag.gov

**STATE OF CONNECTICUT**
WILLIAM TONG
ATTORNEY GENERAL

*/s/ Scott N. Koschwitz*
MATTHEW I. LEVINE
Deputy Associate Attorney General
SCOTT N. KOSCHWITZ
Assistant Attorneys General
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5250
Matthew.Levine@ct.gov
Scott.Koschwitz@ct.gov

**STATE OF DELAWARE**
KATHLEEN JENNINGS
ATTORNEY GENERAL

*/s/ Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
RALPH K. DURSTEIN III
VANESSA L. KASSAB
Deputy Attorneys General
Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
Vanessa.Kassab@delaware.gov

**STATE OF MAINE**
AARON M. FREY
ATTORNEY GENERAL

*/s/ Emma Akrawi*
EMMA AKRAWI
Assistant Attorney General
Natural Resources Division
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
Emma.Akrawi@maine.gov

**STATE OF MARYLAND**
ANTHONY G. BROWN
ATTORNEY GENERAL

*/s/ Steven J. Goldstein*
STEVEN J. GOLDSTEIN
Assistant Attorney General
Office of the Attorney General
of Maryland
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6414
SGoldstein@oag.state.md.us

**COMMONWEALTH OF MASSACHUSETTS**
ANDREA JOY CAMPBELL
ATTORNEY GENERAL

*/s/ Tracy Triplett*
TRACY TRIPLETT
Assistant Attorney General
Environmental Protection Division
Office of the Attorney General for the
Commonwealth of Massachusetts
One Ashburton Place, 18th Floor
Boston, MA 02180
(617) 963-2431
tracy.triplett@mass.gov

**STATE OF MICHIGAN**
DANA NESSEL
ATTORNEY GENERAL

*/s/ Hadley E. Tuthill*
HADLEY E. TUTHILL
NEIL GIOVANATTI
Assistant Attorneys General
Michigan Department of Attorney
General
525 W. Ottawa Street
Lansing, MI 48909
(517) 335-7664
TuthillH@michigan.gov
GiovanattiN@michigan.gov

**STATE OF NEW JERSEY**
JENNIFER DAVENPORT
ATTORNEY GENERAL

*/s/ Lisa J. Morelli*
LISA J. MORELLI
Deputy Attorney General
Division of Law
New Jersey Attorney General's
Office
25 Market Street
Trenton, NJ 08625
(609) 900-0782
Lisa.Morelli@law.njoag.gov

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing motion contains 4,712 words.

/s/ Sean H. Donahue

## CERTIFICATE OF SERVICE

I certify that on May 18, 2026, the foregoing motion was filed via the Court's ECF system, which will provide copies to all registered counsel.

/s/ Sean H. Donahue